DAVIS, Judge
(concurring in part and dissenting in part):
¶ 30 I concur with the majority as to part I but reject both the majority's analysis and its conclusion with respect to part II. I believe that the rule articulated by the majority concerning the existence of a special relationship between university students and their instructors significantly broadens the duty of governmental actors in this setting and is inconsistent with the supreme court's holding in Webb v. University of Utah, 2005 UT 80, 125 P.3d 906.
¶ 31 In Webb, the supreme court gave specific guidance as to when a special relationship arises between university students and their instructors: "[A] special relationship may be created 'by governmental actions
that reasonably induce detrimental reliance by a member of the public.'" Id. ¶ 26 (quoting Day v. State, 1999 UT 46, ¶ 13, 980 P.2d 1171); see also Beach v. University of Utah, 726 P.2d 413, 415 (Utah 1986) (explaining that special relationships "generally arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection" (citing Restatement (Second) of Torts § 314A (1964))). Detrimental reliance giving rise to a special relationship between an instructor and a student is induced when (1) the instructor "alter[s] the academic environment" from a "benign academic setting" in such a way that the student is subjected to peril beyond the "identifiable and obvious danger" the student assumed by participating in the particular academic setting and (2) a reasonable "student would understand that [her] academic success, measured either by the degree of knowledge acquired or by the positive impression made on the instructor, turned on whether" she ignored an obvious danger in order to fulfill a directive of the instructor. See Webb, 2005 UT 80, ¶¶ 23-27, 125 P.3d 906.
¶ 32 The majority rejects the narrow, fact-dependent rule articulated in Webb in favor of a much broader rule recognizing a special relationship whenever a university teacher or coach gives a directive to a student "within the scope of the academic enterprise." See supra ¶ 17.[1] It then imposes a duty of reasonable care on instructors giving any such course-related directives, redefining the risk and control analysis articulated in Webb by asserting that it pertains to the breach of the instructor's duty rather than to the existence of the duty itself.
*324 ¶ 33 The majority justifies this broad rule by relying on the supreme court's holding in B.R. ex rel. Jeffs v. West, 2012 UT 11, 275 P.3d 228, in which it explained that the existence of a duty must be decided "on a categorical basis for a given class of tort claims," see id. ¶ 23. The majority implies that if the existence of a special relationship turns on the specific risks implicated by the instructor's directive, then the rule is not appropriately categorical. As an initial matter, I would observe that it is not our prerogative to reject a rule set down by the supreme court in one of its decisions based on our own contradictory interpretation of language in another of its decisions. See generally State v. Newland, 2010 UT App 380, ¶ 10 n. 5, 253 P.3d 71 ("[U]nder principles of vertical stare decisis, we are prohibited from departing from the precedent established by our supreme court."). In any case, I believe the majority's approach takes the Jeffs rule be-youd its intended seope.
¶ 34 The Jeffs court explained that in determining whether one individual has a duty to another, we begin with the general rule that "we all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others." 2012 UT 11, ¶ 21, 275 P.3d 228. We then examine other factors "in determining whether to carve out an exception to the general rule," including "the foreseeability or likelihood of injury, public policy as to which party can best bear the loss occasioned by the injury, and other general policy considerations." Id. (citations and internal quotation marks omitted). These factors must be considered "at a categorical level" so that we can determine duty "as a matter of law and on a categorical basis for a given class of tort claims." Id. ¶ 23. Thus, the Jeffs court determined that it would be inappropriate to carve out an exception for healthcare providers prescribing drugs that would make "the duty question ... turn on the specific combination of pharmaceuticals ... prescribed or the particular injury that it allegedly caused." Id. The court explained that so long as there were any cireumstances within "[the relevant category of cases consist[ing] of healthcare providers negligently presecrib-ing medications to patients who then injure third parties," a duty should be imposed on all healthcare providers within that category. Id. ¶¶ 27-28. The fact that the negligent prescription of certain, more innocuous medications "may very well involve little foreseeable risk of injury" was irrelevant to the question of duty and only appropriately considered in the context of the more "case-specific and fact-intensive" issues of breach and proximate cause. See id. ¶ 28.
¶ 35 If we were considering whether to carve out an exception to the general rule imposing "a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others," as the Jeffs court was, see id. ¶ 21, I might be inclined to agree with the majority that a rule relying on the nature of the risk or degree of control is not sufficiently categorical. However, the question we must resolve in this case is not whether Instructor is subject to an exception-we know that he is because the public duty doctrine categorically immunizes governmental actors, such as Instructor, from liability except in specified narrow circumstances. See Webb v. University of Utah, 2005 UT 80, ¶¶ 11, 16, 125 P.3d 906 ("As a matter of public policy, we do not expose governmental actors to tort liability for all mishaps that may befall the public in the course of conducting their duties."). Rather, we must determine whether Instructor removed himself from that exception by "creat[ing] a special relationship, where one did not previously exist, by [his] acts," id. ¶ 14.
¶ 36 Although "duty is a purely legal issue for the court to decide," Normandeau v. Hanson Equip., Inc., 2009 UT 44, ¶ 17, 215 P.3d 152, "factual issues may bear on ... issue[s] ... relating] to duty," id. ¶ 21. For example, in Cruz v. Middlekauff Lincoln-Mercury, Inc., 909 P.2d 1252 (Utah 1996), the supreme court considered whether a car dealership had a duty to a third party who was injured when someone stole a car from the dealership after the keys were left in the ignition. See id. at ¶ 253. The categorical rule regarding duty in that cireumstance is that "[o]ne having a lawful right to the possession of property, such as an automobile, although negligent in leaving the keys there *325 in, has no duty to respond in damages caused by a thief who takes it and runs into a third party's vehicle." Id. at 1255 (citation and internal quotation marks omitted). But the court explained that where "special cireum-stances" exist that would have "increase[d] the foreseeability of risk to others" by putting the defendant "on notice that its cars were targeted by thieves," a duty may nevertheless be imposed. Id. at 1255-57. Thus, the court determined that the disputed existence of such cireumstances was a question of fact bearing on the applicability of an exception to the categorical rule imposing no duty, and that the dispute precluded the court from granting a motion to dismiss. See id. at 1257. Similarly, the issue of whether a university instructor's actions give rise to a special relationship is a question of fact bearing upon the legal issue of whether an exception to the public duty doctrine applies.
¶ 37 In a case such as Jeffs, where the categorical rule imposes a duty, it is a simple matter to weigh factual considerations that might ultimately relieve the defendant of liability as part of the breach or proximate cause analysis. However, in a case such as Cruz, and indeed, in the case at hand, where the categorical rule states that a duty does mot exist, factual considerations, such as the risk and control factors relevant to the existence of a special relationship, that might nevertheless make imposition of liability appropriate must be considered as part of the duty analysis or not at all, since resolution of the duty issue disposes of the claim. By adopting an ordinary standard of reasonable care in any cireumstance where a university instructor issues a directive within the seope of the academic enterprise, the majority's approach would have us derive a duty from Instructor's mere failure to observe a standard of care.[2] In my view, Instructor's duty to adhere to such a standard must first be established by determining whether a special relationship arose, an analysis which, under Webb, implicates the risk and control factors discussed above, see supra ¶ 31.
¶ 38 Although an analysis-of duty in the context of university instructors may, at times, require the factfinder to make determinations relating to the fact-dependent special relationship issue, see Normandeau, 2009 UT 44, ¶ 21, 215 P.3d 152; Cruz, 909 P.2d at 1257, I believe that here, as a matter of law, Cope has failed to allege sufficient facts to give rise to a special relationship.[3] "[A] college instructor who has no special relationship with her class members in a benign academic setting can create a special relationship by altering the academic environment." Webb, 2005 UT 80, ¶ 23, 125 P.3d 906. In order to determine whether the academic environment has been altered, however, we must consider the nature of the academic environment in its "benign" state. The academic environment of the ballroom dance team in its benign state involved the students performing lifts. As Cope's expert witness pointed out in her deposition, falls are an inherent risk of doing all lifts. Thus, Instructor's directive that Cope and Partner practice the lift over the left shoulder did not itself require Cope to confront any danger beyond the inherent risk she assumed by *326 participating with the dance team. See generally Orr v. Brigham Young Univ., 960 F.Supp. 1522, 1528 (D. Utah 1994) (determining that a student's "[v]oluntary association with a collegiate athletic team" does not itself give rise to a special relationship between the student and the college), aff'd without published opinion, 108 F.3d 1388 (10th Cir.1997). It was the increased danger of not using spotters while re-learning the lift that allegedly gave rise to a special relationship in this case, not the risk involved in the lift itself.
¶ 39But there is nothing in the facts to suggest that Instructor's directive included, either explicitly or implicitly, a requirement that Cope and Partner practice without spotters. Instructor told Cope and Partner only that they must practice the lift correctly, not that they must practice it without spotters. And there is nothing to suggest that Instruetor would not have permitted the dancers to use spotters had they requested them or even to suggest that Cope did not request spotters because she felt that she lacked the autonomy to make such a request.[4] Thus, it was not necessary for Cope and Partner to ignore internal signs of peril and confront an obvious danger in order to fulfill Instructor's directive; they could have simply asked for spotters.[5] Without evidence that Instructor explicitly directed Cope and Partner that they were required to attempt the corrected lift without spotters, or that Cope's academic success turned on whether she re-learned the lift without spotters, the undisputed facts are insufficient to demonstrate that a special relationship arose between Instructor and Cope.[6] Cf. Webb, 2005 UT 80, ¶ 27, 125 P.3d 906 (determining that an earth science instructor's directive that students walk on icy sidewalks while examining fault lines "did not relate directly to the academic enterprise of the class" and that it was unreasonable "to believe that any student would understand that his academic success ... turned on whether they abandoned all internal signals of peril to take a particular potentially hazardous route to view fault lines").
¶ 40 Because the facts considered in the light most favorable to Cope fail to establish a special relationship between Instructor and Cope, I believe that the trial court correctly granted UVSC's renewed motion for summary judgment. Thus, I would affirm.

. The majority relies on language from Webb emphasizing the relationship between the directive and the academic enterprise of the class, see Webb v. University of Utah, 2005 UT 80, ¶ 27, 125 P.3d 906, in support of its assertion that any directive that is "within the scope of the academic enterprise" gives rise to a special relationship. However, the Webb court explicitly clarified what it meant by a directive "relat[ing] directly to the academic enterprise of the class," stating,
By this we mean [whether] it is ... reasonable to believe that any student would understand that his academic success, measured either by the degree of knowledge acquired or by the positive impression made on the instructor, turned on whether they abandoned all internal signs of peril to [engage in] a potentially hazardous [action]. ...
Id. This clarification indicates that the Webb court intended a much narrower rule than that articulated by the majority in this case. Furthermore, it confirms that the existence of a special relationship does turn, at least to some degree, on the risk implicated by the instructor's directive and the control the instructor exercised over the student.

. And by doing so, the majority's approach significantly undercuts the protection afforded to state university instructors under the public duty doctrine.

. My reasoning differs from that of the trial court. See generally Bailey v. Bayles, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action...." (citation and internal quotation marks omitted)). Unlike the trial court, I do not consider the fact that Cope and Partner had practiced the lift during the week preceding the accident to be relevant to the special relationship analysis because they had never practiced the lift correctly. Viewing the facts in the light most favorable to Cope, it is apparent that the attempt to perform the lift over the left shoulder was both different and more difficult than performing it over the right shoulder. Thus, I agree with Cope that it was risky for her and Partner to have attempted it for the first time without spotters regardless of whether they had practiced it incorrectly during the previous week. Furthermore, I do not agree with the trial court that Cope autonomously rejected an "option" to decline to perform the lift and have it cut from the routine because she could have reasonably expected that being the cause of having the "cool" lift cut from the routine would leave a negative impression on Instructor and affect her position on the team.

. In fact, despite the significant variation in the lift, Partner stated in his deposition, "I didn't think I would need to ask for spotters because I know that any time previous to that I was able to control the lift and to sit her down."

. While Instructor may have been in a better position to determine whether spotters were appropriate under the circumstances, and his failure to provide Cope and Partner with spotters may have been contrary to industry standards for safety, unless and until a special relationship arose, Instructor had no duty to provide spotters, no matter how negligent it may have been for him to fail to do so.

. I also find the majority's reliance on the fact that Instructor's directive was specific to Cope and Partner, rather than to the entire class, to be misguided. -It is the nature of the directive that makes it relevant, not the number of students to whom it is directed. The fact that Cope and Partner's error made it necessary for them to receive individual instruction does not, in and of itself, give rise to a special relationship between them and Instructor.